## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| TERESA BARDAJI | : | |
| 107 Oxford Street | : | |
| Cinnaminson, NJ  08077, | : | |
| Plaintiff, | : | |
| vs. | : | |
| | : | |
| WINNER FORD, | : | |
| 250 Haddonfield-Berlin Road | : | **NO.** |
| Cherry Hill, NJ 08034 | : | |
| And | : | |
| STEVE WINGATE, service Manager of | : | |
| Winner Ford | : | **COMPLAINT – Civil Action** |
| 250 Haddonfield-Berlin Road | : | |
| Cherry Hill, NJ 08034 | : | |
| and | : | |
| MICHELLE HATZIS, President and | : | **DEMAND FOR A JURY** |
| General Manager of Winner Ford | : | |
| 250 Haddonfield-Berlin Road | : | |
| Cherry Hill, NJ 08034, | : | |
| Defendants. | : | |

Plaintiff, Teresa Bardaji ("Plaintiff" or Ms. "Bardaji"), by and through her

undersigned counsel, as and for her Complaint in this action against Defendants Winner

Ford, Steve Wingate and Michelle Hatzis (collectively, "Defendants"), hereby alleges as

follows:

### NATURE OF CLAIMS

This civil action is for monetary damages, to redress Defendants' unlawful

employment practices against Plaintiff, including their discriminatory treatment,

retaliation, hostile work environment and sexual harassment of Plaintiff by defendant

Steven Wingate in the workplace. Subsequent, to Plaintiff's reports of Defendant Wingate's unlawful sexual harassment in the workplace, the co-defendants began to retaliate against Plaintiff and created a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* (Title VII); New Jersey Conscientious Employee Protection Act and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et. seq.* (NJLAD).

## JURISDICTION AND VENUE

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981. The Court has supplemental jurisdiction over the Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination and then a second subsequent charge with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII"). Plaintiff's EEOC charges arise out of many of the same facts alleged herein.

On May 12, 2021, the EEOC issued the Plaintiff a Right to Sue letter which is attached to this complaint as an exhibit. Further, all prerequisites to filing of this suit have been met.

## PARTIES

1.   Plaintiff, Teresa Bardaji, herein and after "Bardaji", is an adult female who resides at 107 Oxford Street, Cinnaminson, New Jersey, 08077.

2.   Defendant Steve Wingate, herein and after "Wingate", was employed by Winner as a Service Manager and held a supervisory position over Plaintiff, Bardaji.

3.   Michelle Hatzis (at her place of work) 250 Haddonfield-Berlin Rd, Cherry Hill, NJ 08034, is the President and General Manager of Winner Ford, who at all relevant times, held supervisory authority over defendant Wingate and Plaintiff, Bardaji.

4.   Defendant, Winner Ford, is a domestic for-profit business-corporation, a car dealership, duly existing under the laws of the State of New Jersey.

5.   Pursuant to New Jersey Rule of Civil Procedure 4:3-2 (a), venue is appropriate in this matter because this matter arises from occurrences at Winner Ford which is located in Cherry Hill, Camden County, New Jersey.

## FACTS

6.   Bardaji was hired on September 3, 2019, as a Rental Services Coordinator at Winner.

7.   On June 1, 2020, Wingate became the Service Manager at Winner and had direct supervisory authority over Bardaji.

3

8.   Almost immediately after becoming the Service Manager, Wingate began staring at Bardaji for extended periods of time to Bardaji's great discomfort.

9.   Wingate learned that Bardaji had a second career as a real estate agent, which she worked after hours and on the weekends when not employed by Winner. Wingate approached Bardaji regarding the purchase of a property.

10. In turn, Wingate began texting and calling Bardaji, after work hours at Winner asking her to arrange private home showings for him.

11. Bardaji felt uncomfortable with Wingate's repeated contacts and requests to show him houses, to be alone with him, she declined to become his real estate agent.

12. Instead, Bardaji referred Wingate to another agent.

13. Not long after, Bardaji entered Wingate's office to ask a work-related question.

14. As Bardaji asked her question, Wingate changed the topic and began discussing aspects of his personal and sexual life that Bardaji found to be inappropriate, disgusting, and offensive.

15. Wingate began by describing to Bardaji the reason why his children no longer speak to him.

16. Wingate told Bardaji that his relationship with his children had been soured by his ex-wife who turned the children against him after she discovered a video camera hidden behind their television with videos of Wingate engaging in sexual activity with multiple women.

4

17. Bardaji was extremely shocked, distraught and struggled to control her emotions and tried to redirect the conversation to the work matter.

18. Bardaji wanted to leave Wingate's office due to her discomfort, but Wingate continued to talk to her.

19. Throughout this encounter, Bardaji felt depressed, disgusted, and extremely uncomfortable, but maintained her composure and did her best to ignore and get through Wingate's sexually charged conversation.

20. Bardaji believed that even though she had worked at Winner longer than Wingate, he could terminate her at his discretion and negatively impact her opportunities to advance at work and or if she sought future employment.

21. Bardaji enjoyed her job at Winner and did not want to lose it, so she was reluctant to report Wingate's behavior and comments for fear of retaliation.

22. Bardaji is a single mother of two children, with a mortgage and child expenses and did not want to lose her stable employment at Winner.

23. Bardaji enjoyed her job at Winner Ford and had received excellent reviews throughout her employment at Winner Ford.

24. A short time after the preceding incident, Wingate began calling Bardaji "teacup" and "buttercup" voicing these "pet names" in front of Winner customers and co-workers. Bardaji again felt extremely uncomfortable by Wingate's moniker of her.

25. On multiple occasions, Bardaji saw Wingate intensely staring at her body behind reflective glass for extended periods of time.

26. Bardaji felt extremely disturbed by Wingate's frequent staring at her body and the use of the "pet names" stated above.

27. On one occasion, Bardaji wore lipstick to work and when Wingate saw Bardaji he announced, "look at you…. looking all pretty for us today."

28. After that, Bardaji felt uncomfortable wearing makeup and chose to wear a mask all day to avoid further comments from Wingate and further discomfort at work.

29. On a subsequent occasion, Wingate entered Bardaji's office unannounced and maneuvered himself into a two-foot gap between Bardaji's filing cabinet and back wall and commented to her that he found a "great hiding spot."

30. Wingate then exited the "hiding spot" but remained in her office when a male co-worker entered.

31. In front of the co-worker, Wingate said that he and Bardaji could just "close the blinds for some privacy."

32. Bardaji and her co-worker exchanged concerned glances in reaction to Wingate's statement.

33. It was clear to Bardaji that Wingate was persisting in a pattern of sexual harassment toward her and other female co-workers.

34. Bardaji observed Wingate's attention drawn to another female co-worker named Stefani who was also being subjected to Wingate's sexual harassment.

35. Stefani advised Bardaji that Wingate "gave her creepy vibes" and that she often noticed Wingate staring at her, specifically her body.

36. Bardaji reported her claims of sexual harassment to Hatzis.

37. On or about July 15, 2020, Bardaji reported Wingate's conduct to the office of defendant Michelle Hatzis.

38. On or about July 17, 2020, in response to Bardaji's report of Wingate's acts, Hatzis scheduled a meeting for the following Monday.

39. On July 20, 2020, at 8 AM, Bardaji was contacted by Winner's Comptroller (Mary G.) requesting that Bardaji participate in a teleconference with her and Hatzis.

40. During the teleconference, the Comptroller took notes of what Bardaji reported to Hatzis.

41. At the meeting, Bardaji reported Wingate's acts and included that he often called her by the nickname he gave her of "teacup."

42. Hatzis responded by saying to Bardaji that the intent behind the nickname "teacup" was a compliment by Wingate and not made to harass her.

43. Hatzis attempted to justify Wingate's "teacup" comments by saying that Wingate believed Bardaji reminded him of the teacup ride at Disneyland because of her energy level and energy drink consumption.

44. As Bardaji was speaking, Hatzis interrupted and insisted that from that point on she cannot share reports of Wingate's acts with anyone else.

45. Hatzis essentially placed a "gag order" on the incident and ordered Plaintiff that she could not share any information about Wingate to any other employee.

46. Hatzis stated that the report against Wingate "can really look bad for the dealership if it gets out."

47. Hatzis seemed irritated by Bardaji's report of an earlier conversation with her co-worker Stefani about Wingate.

48. Hatzis suggested that Bardaji's report of Wingate's acts caused Stefani to start viewing Wingate in a negative light.

49. Again, Hatzis reiterated her order to Bardaji not to discuss anything that was addressed in the meeting with anyone.

50. A few hours later, Bardaji was called to another meeting with Hatzis, Rucci, and the Comptroller (Mary G.) to discuss a "promotion."

51. This alleged promotion had been brought to Bardaji months earlier but was not offered.

52. Once Bardaji reported Wingate's acts she was offered the "promotion," which was a position in another office away from Wingate's office.

53. The alleged "promotion" was not a promotion, but a reason to move Bardaji away from Wingate.

54. The promotion Bardaji received kept her with the same prior job assignment but added the duties of another position and did not include a raise in pay.

55. Upon receiving this "promotion," Bardaji approached her new direct supervisor, Rucci, requesting an increase in pay given the additional workload.

56. Rucci denied the request, citing instructions from Hatzis that a pay increase would only be given if the department was built up by Bardaji.

57. By information or belief, the "promotion" was a ploy by the defendants to add more work for Bardaji and make her uncomfortable with the hopes that she would leave and quit her job.

58. Notwithstanding, Bardaji "toughed it out", continued to work at her best skill level, behaved in a professional manner but felt uncomfortable and singled out by Hatzis and other supervisors for her report against Wingate.

59. On August 21, 2020, Bardaji met with Hatzis who questioned Bardaji if she had made any comments to others about her issues with Wingate.

60. Hatzis advised Bardaji that several other co-workers knew about the allegations against Wingate and that she wanted to know if Bardaji violated their agreement to remain silent after the meeting.

61. Bardaji reiterated that Wingate often made inappropriate comments in the open that were likely overheard resulting in the alleged gossip.

62. Hatzis responded that "someone isn't telling the truth" and they "have specific details on what happened."

63. Hatzis then told Bardaji that if the rumors persisted or more information of Wingate's acts were to be revealed that the employee found to have done so would be immediately terminated.

64. At the end of the meeting, Hatzis again ordered Bardaji to remain silent about her claims regarding Wingate and not disclosing them to any Winner Ford employees.

65. Ordering Bardaji to remain silent under a threat of termination of employment was a continued effort by Hatzis to deter others from coming forward with complaints against Wingate.

66. During the hearing, Hatzis insinuated that Bardaji had spoken to other employees about her workplace sexual harassment by Wingate, after she was ordered to remain silent and again warned Bardaji of the consequences of speaking about her sexual harassment.

67. Bardaji understood Hatzis' warning, that if Wingate's acts were revealed by her, to another employee, she would be terminated.

68. From that point on, Plaintiff began searching for other employment after the last meeting with Hatzis, but she could not afford to take a job for less money than she was making.

69. On April 15, 2021, Plaintiff Bardaji, tendered her two-week resignation, by email, to defendant Michelle Hatzis and Winner Ford on or about May 1, 2021.

70. The Defendants' actions caused Bardaji to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

71. As a result of the acts and conduct complained of herein, Bardaji has suffered pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Bardaji has further experienced severe emotional and physical distress.

72. The above are just some examples of some of the discrimination to which Defendants subjected Bardaji.

<u>**COUNT ONE**</u>
<u>**Sexual Harassment and Discrimination**</u>
<u>**Pursuant to Title VII of the Civil Rights Act of 1964,**</u>
<u>**42 U.S.C. §§ 2000e *et. seq.***</u>
<u>**Bardaji vs. all defendants**</u>

Sexual Harassment is a form of sex discrimination that violates Title VII of the Civil Rights Act of 1964. Sexual Harassment is defined in part as the "*unwelcome*" sexual advances and other verbal or physical conduct of a sexual nature that explicitly or implicitly affects and individual's employment and interfere with an individual's work performance or create a hostile or offensive work environment.

73. Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

74. Plaintiff was subject to Sexual Harassment by Defendant Wingate which included offensive, "unwanted", descriptive and inappropriate comments about his sexual life.

75. Plaintiff was subject to "unwanted" comments about her appearance and "unwanted" sexually suggestive comments by Wingate directed at Plaintiff.

76. Plaintiff was also subject to unwanted attention by Wingate who attempted on many occasions to arrange for him and Plaintiff to be alone. Specifically, Wingate on several occasions asked Plaintiff to arrange for house showings were he and her would be the only two viewing properties for sale.

77. Plaintiff was also subject to Wingate concealing himself in her office and suggesting that they close the blinds so no one could see in.

78. Plaintiff was also subject to "unwanted" staring of her body by Wingate to the point of severe discomfort, mental distress and often depression as the result of Wingate's acts.

79. Defendant Wingate exhibited the afore-stated inappropriate behavior toward Plaintiff throughout the time that she reported to him as her supervisor.

80. Plaintiff, a single mother with a mortgage payment, was afraid to speak out about Wingate's unwelcome behavior because she believed that he could terminate her employment and/or create a hostile environment for her.

81. Defendant Wingate's "unwelcome" behavior got to the point which Plaintiff was constantly uncomfortable, disturbed, and fearful at work.

82. Defendant Wingate's actions caused Plaintiff to feel extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

83. Plaintiff's emotional distress and emotional injuries were severe and of the nature that no reasonable person should have to endure.

84. Plaintiff suffered mental and emotional harm, fright, and anxiety which has manifested itself in physical symptoms.

85. At all relevant times, Defendant Wingate was a supervisor at Winner Ford and reported directly to Defendant Hatzis.

86. At all relevant times, Defendant Wingate was acting within the scope of his employment as he made these inappropriate actions and comments while at work and during work-based conversations, while he held a supervisory role over Plaintiff.

**COUNT TWO**
**Retaliation for Plaintiff's Report of Sexual Harassment**
**Pursuant to Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e *et. seq.***
***Bardaji vs. Winner Ford and Michelle Hatzis***

To establish a *prima facie* case of retaliation, plaintiff must show that 1) she was engaged in a protected activity known to the defendant; 2) she was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two. *Woods-Pirozzi v. Nabisco Foods*, 290 N.J. Super. 252, 274, 675 A.2d 684, 695, (App. Div. 1996).

87.     Plaintiff engaged in a protected activity when she reported the acts and wrongdoings of Defendant Wingate to Defendant Hatzis and Defendant Winner.

88.     On July 20, 2020, Hatzis and Bardaji met to discuss Wingate's sexual harassment and instances of "unwanted" conduct.

89.     Plaintiff was subject to adverse employment decision where Hatzis ordered Bardaji to not disclose ("gag order") Wingate's acts to anyone else and threatened termination of employment if any employees were found to be discussing workplace sexual harassment that the employee would be terminated.

90.     Defendant Hatzis ordered that Bardaji not discuss Wingate's behavior with any other employee and insisted that Bardaji's report of Wingate's acts to her co-worker Stefani caused her to view Wingate in a negative light.

91.     Hatzis "gag order" on Bardaji was constructed to minimize the Plaintiff's complaints against Wingate and to stop others from coming forward with complaints against Wingate.

92.     Plaintiff was subject to an adverse employment decision, where immediately after her meeting with Hatzis, Bardaji was called to a second meeting with Hatzis, Rucci, and the Comptroller (Mary G.) to discuss a "promotion."

93.     The alleged "promotion" kept Plaintiff at her same prior job assignment, added the duties of another position and did not include a raise in pay.

94.     The alleged "promotion" was a ploy by the defendant Hatzis to add more work for Bardaji to do, without additional compensation.

95.     Plaintiff's alleged promotion was an adverse employment decision by Hatzis, on behalf of Winner Ford, against Bardaji because of her reports against Wingate.

96.     Defendant Hatzis' decision to promote Plaintiff added more stress and anxiety to Bardaji who was purposely overloaded with work.

97.     Hatzis' adverse employment decision against the Plaintiff would ultimately lead to Bardaji's "constructive termination."

98.     There is a causal link between Bardaji's report of Wingate's "unwanted conduct"; Bardaji's conversation with a co-worker female named Stefani (who was also targeted by Wingate) and Bardaji's subsequent promotion which was a ploy to give Bardaji more duties, without an increase in pay, with the intent of pushing Bardaji to resign her position.

99.     At all relevant times, Defendant Hatzis as President and General Manager was acting within the scope of her employment to advance her and Winner's agenda.

**COUNT THREE**
**Hostile Work Environment for Report of Sexual Harassment**
**Pursuant to Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e *et. seq.***
**Against all the defendants**

To establish a Hostile Work Environment claim against an employer, a plaintiff must prove the following: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability. *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

100.     Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

101.     Plaintiff was sexually harassed by her supervisor defendant Wingate who was employed at Winner Ford.

102.     Wingate's harassment of Plaintiff was pervasive and regular and included "unwanted" inappropriate acts and constant descriptive comments about his sexual activities with other women.

103.     Wingate's constantly made "unwanted" comments to Plaintiff about her physical appearance.

104.     Wingate also constantly made "unwanted" sexually suggestive comments directed at Plaintiff.

105.     Wingate constantly called the Plaintiff by inappropriate pet names in front of customers and co-workers while at Winner Ford.

16

106.    One instance of Wingate "unwanted" conduct occurred when he attempted to conceal himself in Plaintiff's office and suggested to Plaintiff that they close the blinds in her office so no one could see them in her office.

107.    Every day, Wingate stared at Plaintiff's body to the point of severe discomfort, emotional distress, stress and anxiety to Plaintiff.

108.    Plaintiff feared and dreaded going to work each day, afraid that she would be subject to Wingate's continued harassment.

109.    Plaintiff's oppressive work environment was so severe and of the nature that no reasonable person should have to endure.

110.    Wingate's "unwanted" conduct and acts were so regular and pervasive, committed daily by Wingate toward Plaintiff, without impunity, to an extent that would detrimentally affect a reasonable person of the same sex in that position.

111.    As the result of Wingate's conduct, Plaintiff felt extremely humiliated, offended, intimidated, degraded, victimized, embarrassed, emotionally distressed and her workplace environment became offensive and oppressive.

112.    At all relevant times, Defendant Wingate was acting within the scope of his employment as he made these inappropriate actions and comments while at work and during work-based conversations, while he held a supervisory role over Plaintiff.

**COUNT FOUR**
**Civil Conspiracy**
**Pursuant to Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e _et. seq._**
**_Against all the defendants_**

113.    Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

114.    It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

115.    Defendants engaged in an unlawful discriminatory practice in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e _et. seq._ by conspiring to commit and allow the discriminatory conduct to occur against Plaintiff.

116.    Plaintiff reported to Hatzis all of the instances of sexual discrimination, hostile work environment and distress that she was exposed to by Wingate.

117.    Plaintiff reported to Hatzis that Wingate made her uncomfortable and that she was distressed by his constant acts.

118.    Defendant Hatzis response seemingly justified instances where Wingate called Plaintiff by "pet names."

119.    Specifically, Hatzis explained that Wingate's "nicknames" for Plaintiff were meant as compliments, and not to harass her.

120.    Defendant Hatzis further justified these "nicknames" by claiming that Plaintiff reminded Defendant Wingate of the "teacup" ride at Disneyland because of her energy level and energy drink consumption.

121.    Moreover, Defendant Hatzis interrupted Plaintiff as she reported Wingate's conduct and Hatzis ordered Plaintiff that she not share reports of Defendant Wingate's acts with anyone else.

122.    Defendant Hatzis told Plaintiff that the report against Wingate "....can really look bad for the dealership if it gets out" and further ordered Plaintiff not to discuss anything that was addressed in the meeting with co-workers, employees or anyone else.

123.    On August 21, 2020, Defendant Hatzis accused Plaintiff of violating the "gag" order imposed by Hatzis that Plaintiff remain silent about any reports she made against Wingate.

124.    Hatzis alleged that several other co-workers had found out about the reports and now knew about the allegations against Wingate.

125.    When Plaintiff denied not violating the "gag order", Defendant Hatzis claimed "...someone isn't telling the truth...because other co-worker have specific details on what happened." Meaning details of the report by Plaintiff to Hatzis against Wingate.

126.    Defendant Hatzis threatened to Plaintiff that if the rumors persisted or more information of Defendant Wingate's acts were to be revealed that the employee found to have done so would be immediately terminated.

127.    Plaintiff took Defendant Hatzis' words as a threat against her employment, that any further information regarding Defendant Wingate's unlawful behavior would be attributed to her and that she would be terminated.

128.    Defendant Hatzis conspired with Defendants Winner and Wingate to keep Plaintiff quiet about Wingate's unlawful behavior by putting her in fear for her job and vy justifying Wingate's behavior to escape civil liability.

**COUNT FIVE**
**New Jersey Law Against Discrimination**
**for Sexual Discrimination and Harassment,**
**N.J.S.A. 10:5-1 _et. seq._ (NJLAD)**
**_Against all the defendants_**

129.    Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

130.    It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability…to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. N.J. Stat. § 10:5-12.

131.    Defendants engaged in an unlawful discriminatory practice in violation of N.J. Stat. § 10:5-12 by subjecting Plaintiff to sexual harassment including inappropriate actions and comments by her supervisor at her place of employment.

132.    Defendant Wingate exhibited the afore-stated inappropriate behavior toward Plaintiff throughout the time that she reported to him as her supervisor.

133.    Defendant Wingate's "unwelcome" behavior got to the point where Plaintiff was constantly uncomfortable, disturbed, anxious and emotionally distressed and fearful at work.

134.    Defendant Wingate's actions caused Plaintiff to feel extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

135.    Plaintiff's emotional distress and emotional injuries were severe and of the nature that no reasonable person should have to endure.

136.    Plaintiff suffered mental and emotional harm, fright, and anxiety which has manifested itself in physical symptoms.

137.    At all relevant times, Defendant Wingate was a supervisor at Winner Ford and reported directly to Defendant Hatzis.

138.    At all relevant times, Defendant Wingate was acting within the scope of his employment as he made these inappropriate actions and comments while at work and during work-based conversations, while he held a supervisory role over Plaintiff.

**COUNT SIX**
**New Jersey Law Against Discrimination**
**for Retaliation,**
**N.J.S.A. 10:5-1 *et. seq.* (NJLAD)**
***Against all the defendants***

139.    Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

140.    It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:  For any person to take reprisals against any person because that person has opposed any practice or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act, or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act. N.J. Stat. § 10:5-12(d).

141.    Defendant engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of her employer.

142.    Plaintiff engaged in a protected activity when she reported the acts and wrongdoings of Defendant Wingate to Defendant Hatzis and Defendant Winner.

143.    On July 20, 2020, Hatzis and Bardaji met to discuss Wingate's sexual harassment and instances of "unwanted" conduct.

22

144.     Plaintiff was subject to adverse employment decision where Hatzis ordered Bardaji to not disclose ("gag order") Wingate's acts to anyone else and threatened termination of employment if any employees were found to be discussing workplace sexual harassment that the employee would be terminated.

145.     Hatzis suggested that Bardaji's report of Wingate's acts to her co-worker Stefani caused her to view Wingate in a negative light.

146.     Hatzis "gag order" on Bardaji was to deter others from coming forward with complaints against Wingate.

147.     Plaintiff was subject to an adverse employment decision, where immediately after her meeting with Hatzis, Bardaji was called to a second meeting with Hatzis, Rucci, and the Comptroller (Mary G.) to discuss a "promotion."

148.     The alleged "promotion" Bardaji was awarded kept her at the same prior job assignment, added the duties of another position and did not include a raise in pay.

149.     Upon receiving this "promotion," Bardaji requested an increase in pay given the additional workload, but an increase was ultimately denied by defendant Hatzis.

150.     The "promotion" was a ploy by the defendant Hatzis to add more work for Bardaji to do, without additional compensation, to add more stress and anxiety to Bardaji which would ultimately lead to Bardaji's resignation or termination.

151.     By information or belief, the promotion was an adverse employment decision by Hatzis, on behalf of Winner Ford, against Bardaji.

23

152.   There is a causal link between Bardaji's report of Wingate's "unwanted conduct", Bardaji's conversation with a co-worker female named Stefani (who was also targeted by Wingate), which irritated Hatzis and Bardaji's subsequent promotion, a ploy to give Bardaji more duties, without an increase in pay, with the hope that Bardaji would resign her position.

153.   At all relevant times, Defendant Hatzis as President and General Manager was acting within the scope of her employment to advance her and Winner's agenda.

### COUNT SEVEN
### New Jersey Law Against Discrimination
### for Hostile Work Environment,
### N.J.S.A. 10:5-1 *et. seq.* (NJLAD)
### *Against all the defendants*

154.   Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

155.   It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability…to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. N.J. Stat. § 10:5-12.

156.    Defendants engaged in an unlawful discriminatory practice by subjecting Plaintiff to oppressive work environment conditions which were so severe and of the nature that no person should have to endure.

157.    Plaintiff was sexually harassed by her supervisor defendant Wingate who was employed by Winner Ford and supervised by the President and General Manager of Winner Ford, defendant Michelle Hatzis.

158.    Wingate's harassment of Plaintiff was pervasive and regular which included "unwanted" inappropriate acts and comments about his sexual life; "unwanted" comments about her appearance; "unwanted" sexually suggestive comments by Wingate directed at Plaintiff; the "unwanted" use of inappropriate pet names by Wingate;   an instance of Wingate concealing himself in Plaintiff's office and suggesting that they close the blinds in her office so no one could see in; and, the "unwanted" staring at Plaintiff's body to the point of severe discomfort on Plaintiff's behalf.

159.    Plaintiff feared that if she ignored Wingate, he would have her employment terminated since he was her supervisor.

160.    Plaintiff feared and dreaded going to work each day, afraid that she would be subject to Wingate's continued harassment.

161.    Plaintiff's oppressive work environment was so severe and of the nature that no reasonable person should have to endure.

162.     Wingate's "unwanted" conduct and acts were so regular and pervasive to an extent that would detrimentally affect a reasonable person of the same sex in that position.

163.     As the result of Wingate's conduct, Plaintiff felt extremely humiliated, offended, intimidated, degraded, victimized, embarrassed, emotionally distressed and her workplace environment became offensive and oppressive.

164.     At all relevant times, Defendant Wingate was acting within the scope of his employment as he made these inappropriate actions and comments while at work and during work-based conversations, while he held a supervisory role over Plaintiff.

**COUNT EIGHT**
**New Jersey Law Against Discrimination**
**for Civil Conspiracy,**
**N.J.S.A. 10:5-1 *et. seq.* (NJLAD)**
***Against all the defendants***

165.     Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

166.     It shall be an unlawful employment practice: for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so. N.J. Stat. § 10:5-12(e).

167.     Defendants engaged in an unlawful discriminatory practice in violation of N.J. Stat. § 10:5-12(e) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

168.    When Plaintiff reported the instances in which Defendant Wingate made her uncomfortable, Defendant Hatzis replied by claiming Defendant Wingate's "nicknames" for Plaintiff were meant as compliments, and not to harass her.

169.    Defendant Hatzis further justified these "nicknames" by claiming that Plaintiff reminded Defendant Wingate of the "teacup" ride at Disneyland because of her energy level and energy drink consumption.

170.    Defendant Hatzis interrupted Plaintiff during the conversation in which Plaintiff reported these instances and insisted that she not share reports of Defendant Wingate's acts with anyone else.

171.    Specifically, Defendant Hatzis told Plaintiff that the report against Defendant Wingate "can really look bad for the dealership if it gets out" and ordered Plaintiff not to discuss anything that was addressed in the meeting with anyone else.

172.    On August 21, 2020, Defendant Hatzis questioned Plaintiff to see if she had violated the agreement to remain silent after their initial meeting and alleged that several other co-workers knew about the allegations.

173.    When Plaintiff denied discussing Defendant Wingate with other co-workers, Defendant Hatzis claimed that "someone isn't telling the truth" because other co-workers "have specific details on what happened."

174.    Defendant Hatzis then told Plaintiff that if the rumors persisted or more information of Defendant Wingate's acts were to be revealed that the employee found to have done so would be immediately terminated.

175.     Plaintiff took Defendant Hatzis' words as a threat against her employment that any further information regarding Defendant Wingate's unlawful behavior would be attributed to her and that she would be terminated.

176.     Defendants conspired to keep Plaintiff quiet about the unlawful behavior of Defendant Wingate towards Plaintiff by putting her in fear for her job and attempting to justify the words and actions of Defendant Wingate.

<u>**COUNT NINE**</u>
**For Adverse Employment Actions,**
<u>**New Jersey Conscientious Employee Protection Act**</u>
<u>***Against Defendant Hatzis and Defendant Winner***</u>

177.     Plaintiff hereby incorporates the prior paragraphs as if the same were set forth fully here at length.

178.     The New Jersey Conscientious Employee Protection Act ("CEPA") prohibits employers from taking adverse employment actions against employees who disclose, object to, or refuse to participate in certain actions that the employee reasonably believes to be either illegal or in violation of public policy.

179.     Defendants took adverse action against Plaintiff by prohibiting her from speaking with her co-worker Stefani regarding the harassment that both women were subjected to by Defendant Wingate.

180.     When Plaintiff reported the harassment to Defendant Hatzis, she provided information about a conversation and Stefani had about the inappropriate comments and behavior of Defendant Wingate.

181.    Defendant Hatzis seemed irritated that Plaintiff discussed this with her co-worker and placed a "gag" order on Plaintiff as the reported harassment could result in Defendant Winner being viewed in a negative light.

182.    Defendant Hatzis later reminded Plaintiff of this "gag" order as there were alleged rumors going around the dealership about Defendant Wingate's inappropriate behavior. Specifically, Defendant Wingate threatened to terminate the employment of Plaintiff or any other employee who was found to be discussing this matter.

183.    Plaintiff was fearful for her job due to this threat and felt Defendant Hatzis and Defendant Winner were punishing her for making the report against Defendant Wingate.

184.    Defendants' actions towards Plaintiff after her report of Defendant Wingate's actions were unlawful and prohibited by the CEPA.

WHEREFORE, for all the foregoing reasons, as a result of the acts and conduct complained of herein against the defendants, Accordingly, Plaintiff seeks damages for pecuniary losses, damages for severe emotional pain, damages for physical and emotional distress, pecuniary and non-pecuniary losses and punitive damages and any other remedy or damages which this Court deems appropriate against all the defendants.

SCHATZ, STEINBERG & KLAYMAN

JONATHAN D. ROSENAU (NJ
SCHATZ, STEINBERG & KLAYMAN
1500 JFK Boulevard, Suite 1300
Philadelphia, PA  19102
Phone: 215-845-0250
Fax: 215-845-0255
Email: jrosenau@s2firm.com
*Attorney for plaintiff*

Date: July 30, 2021

Exhibit A

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:   **Teresa Bardaji**
      **107 Oxford Street**
      **Cinnaminson, NJ 08077**

From:  **Philadelphia District Office**
       **801 Market Street**
       **Suite 1000**
       **Philadelphia, PA 19107**

|  | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2021-00154** | **Legal Unit,** **Legal Technician** | **(267) 589-9707** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Dana R. Hutter*

**5/12/2021**

Enclosures(s)

**Dana R. Hutter,**
**Deputy Director**

*(Date Issued)*

cc:  **Kristy Krasowski, Esq.**
     **10 PARSONAGE RD**
     **STE 300**
     **Edison, NJ 08837**

**Andres Jalon, Esq.**
**JALON & ASSOCIATES ATTORNEYS AT LAW**
**Two Penn Center, John F, Kennedy Bld, Suite 1300**
**Philadelphia, PA 19102**

Enclosure with EEOC
Form 161 (11/2020)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***